# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1547

_____

Steven E. Clason,

        Appellant,

v.

Mike Johanns, in his official capacity
as Secretary, United States Department
of Agriculture and Chairman of the
Board of Directors of the Commodity
Credit Corporation,

        Appellee.

Appeal from the United States
District Court for the
District of Nebraska.

_____

Submitted: November 16, 2005
Filed: February 22, 2006

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Steven Clason appeals a judgment affirming a decision by the National Appeals Division (NAD) of the Department of Agriculture that he owed the federal government $9,703.62 plus interest for the unpaid balance of a marketing assistance loan. The dispute centers on whether Mr. Clason was entitled to repay the loan at an advantageous rate when he sold, but did not physically deliver, the corn securing the

loan. The local office of the Farm Service Agency (FSA) (an agency of the Agriculture Department) determined that in order to repay the loan at the lower amount, Mr. Clason was required to make physical delivery of the corn to the buyer. After exhausting his administrative appeals, Mr. Clason sought review in the district court,[1] which affirmed the agency's decision. Mr. Clason appealed that decision to this court, and we affirm.

### I.

In October, 1998, Mr. Clason accepted a marketing assistance loan for over $66,000 from the Commodity Credit Corporation (CCC), a federal corporation within the Department of Agriculture. As required by the loan's terms, Mr. Clason gave the CCC a security interest in 36,000 bushels of corn valued at $1.86 per bushel. He agreed not to move the corn from where it was stored on his property or to co-mingle it with other corn without the CCC's approval.

Under the terms of the loan, the interest rate was set at 5.875% and payment was due in July, 1999. The loan program, however, allowed farmers to discharge a marketing assistance loan at a reduced rate if the price of corn dropped during the term of the loan. 7 C.F.R. § 1421.25(b), (c) (1998). Several weeks before the loan was due, Mr. Clason sought approval from the local FSA office, which administers CCC loans, to sell and deliver more than 30,000 bushels of the corn to his brother. To obtain approval from the FSA, Mr. Clason executed a standardized form, CCC-681-1, titled "Authorization for Delivery of Loan Collateral For Sale." The authorization form provided a repayment rate of $1.49 per bushel "for any quantity delivered on or before" July 26, 1999. Another provision of the form stated that the CCC's security interest would be released "only if the CCC receives payment at the [Furnas County FSA Office] for the quantity of commodity delivered to the buyer."

---

[1]The Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska, sitting by consent of the parties. *See* 28 U.S.C. 636(c); *see also* Fed. R. Civ. P. 73.

In August, Mr. Clason notified the Furnas County FSA office that, although he had sold the bulk of his corn to his brother, only 8,573 bushels of corn had been transferred from his storage bins to his brother's operation. The rest of the corn remained in his possession. Mr. Clason nonetheless contended that because that corn now belonged to his brother, it had been "delivered" and he was entitled to the lower repayment rate. In addition, Mr. Clason maintained that he had spoken with an FSA employee prior to the July 26 deadline, and that the employee had assured him that physical delivery was not necessary.

Upon learning that Mr. Clason had not made physical delivery of all of the corn that he had sold to his brother, the FSA determined that Mr. Clason owed the full repayment amount of $1.935 per bushel for the corn that remained in his possession. After accepting as partial payment the checks that Mr. Clason tendered, the FSA calculated an outstanding balance due of $9,703.62.

Pursuant to Agriculture Department procedure, Mr. Clason appealed the deficiency notice to the FSA county committee, which determined that Mr. Clason's failure to make physical delivery of the corn disqualified him from repaying the lower rate. Mr. Clason then unsuccessfully appealed to the FSA state committee and to the NAD, the latter of which held an evidentiary hearing. The NAD hearing officer concluded that physical delivery was required to qualify for the lower rate, and the NAD National Director upheld that decision. His administrative appeals exhausted, Mr. Clason sought review in the district court. The magistrate judge determined that the administrative decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and therefore affirmed the agency determination.

## II.

Mr. Clason contends that the meaning of the term "delivery," as used on the CCC-681-1 form, is not confined to physical delivery. Neither the form nor the

regulations governing marketing assistance loans provide a definition of "delivery." Our task is not to interpret the contract independently, but instead to determine whether the NAD's interpretation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and should be set aside pursuant to the provisions of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

Because we are reviewing an agency's interpretation of a term in a document that it created, we must first determine the level of deference to give to the NAD's construction of that term. *See Rain & Hail Ins. Serv., Inc. v. Federal Crop Ins. Corp.*, 426 F.3d 976, 979 (8th Cir. 2005). In this case, the interpretation at issue involves the language on the CCC-681-1 form. The regulations governing the marketing assistance loans authorized the CCC to set the terms and conditions of the CCC-681-1 form. *See* 7 C.F.R. § 1421.20(a) (1998). The terms of CCC-681-1 involve complex matters within the Department of Agriculture's area of expertise, namely, the repayment terms of subsidized agricultural commodity loans. We also note that the NAD's appeal process, which provided Mr. Clason with a face-to-face hearing, *see* 7 U.S.C. § 6991-7002, qualifies as formal adjudication. *Lane v. United States Dep't of Agriculture*, 120 F.3d 106, 108-110 (8th Cir. 1997). Because of the NAD's expertise and the extensive administrative review afforded to Mr. Clason, we will afford the NAD's interpretation the same level of deference afforded to an agency's interpretation of its own regulations. *See Rain & Hail Ins.*, 426 F.3d at 979 (citing *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991)). This deferential approach requires us to accept the NAD's interpretation of the term "delivery" unless that interpretation is "plainly erroneous." *Rain & Hail Ins.*, 426 F.3d at 979 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

In this case, the NAD determined that the "delivery" required by CCC-681-1 was physical delivery. This was not plainly erroneous. The regulations governing these transactions during the relevant time period referred to the "removal of" and "moving" of farm-stored commodities. *See* 7 C.F.R §§ 1421.20(a), (e); 1421.23(b)

(1998).  By requiring producers who wish to take advantage of the favorable repayment rate to make physical delivery to the buyer, the Agriculture Department rationally may have believed that it was promoting the actual use of commodities.  In any case, although the word "delivery" can be interpreted to include constructive delivery, *see, e.g.,* Black's Law Dictionary (8th ed. 2004), the NAD's interpretation is reasonable and consistent with the regulations governing marketing assistance loans.

Mr. Clason contends that the agency has changed its definition of the word "delivery" and therefore the NAD's interpretation deserves no weight.  Although an inconsistent agency interpretation is less authoritative than a consistent one, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987), Mr. Clason has not identified any previous administrative or judicial decision that establishes a contrary government interpretation.  Instead he points to a statement in the record from an Agriculture Department official that "the FSA currently, and for the past several years, has interpreted and defined 'delivery' as the movement to a purchaser of a commodity under loan" to the CCC.  Mr. Clason contends that this language necessarily leads to the conclusion that the FSA used a different definition of the term at some previous time.  We disagree.  The language quoted above, by itself, is insufficient to support Mr. Clason's inference that the FSA has used more than one definition of the term "delivery."

## III.

In the alternative, Mr. Clason argues that the government is estopped from requiring physical delivery because of his reliance upon assurances that he allegedly received from a county FSA officer. The FSA officer stated at the hearing that she did not recall telling Mr. Clason that constructive delivery was acceptable.  Even if she had made such statements, however, they would not be sufficient to support the application of estoppel against the federal government.  Any claim of equitable estoppel against the government would require proof "that the government committed affirmative misconduct." *Charleston Housing Auth. v. U.S. Dep't of Agric.*, 419 F.3d

729, 739 (8th Cir. 2005). The record here does not contain any evidence of affirmative misconduct. At most, the FSA officer's comments were the product of negligence, which is insufficient to satisfy Mr. Clason's heavy burden of proof. *See Morgan v. C.I.R.*, 345 F.3d 563, 566-67 (8th Cir. 2003).

## IV.

For the reasons stated above, the judgment of the district court is affirmed.

_____